# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY B REALTY, LLC,<br>　　　　　Plaintiff,<br><br>v.<br><br><br>DANIELSON, LLC,<br>DIMITRIOUS MOUTOUDIS, and<br>TOUDIS, LLC,<br>　　　　　Defendants. | **CIVIL ACTION**<br>**NO. 18-40067-TSH** |

## MEMORANDUM OF DECISION AND ORDER
### April 22, 2020

**HILLMAN, D.J.**

### Background

Jenny B Realty, LLC ("Jenny B" or "Plaintiff") has filed claims against Danielson, LLC ("Danielson"), Demetrious Moutoudis ("Moutoudis"), and Toudis, LLC ("Toudis" and, together with Danielson and Toudis, "Defendants") for Breach of Contract (Count I), Tortious Interference With Contractual Relations (Count II), an Action to Reach and Apply (Count III), violation of Mass.Gen.L. ch. 109A, the Massachusetts Fraudulent Transfer Act ("MFTA")(Count IV), and Breach of Fiduciary Duty (Count V). Jenny B's claims arise out of the termination of a lease agreement between Jenny B and Danielson for property located at 483 Providence Road, Brooklyn, Connecticut (the "Property") which Danielson utilized to operate a Dunkin Donuts franchise. This Memorandum and Order of Decision addresses:  Plaintiff's Motion for Summary Judgment (Docket No. 31), Defendants Dimitrious Moutoudis and Toudis LLC's Motion For Summary

Judgement (Docket No. 35), and Defendants' Motion to Strike Paragraphs 10 and 13 of the Affidavit Joaquim Lopes (Docket No. 44).

For the reason set forth below, the motion to strike is *denied.* Plaintiff's motion for summary judgment is *granted*, in part, and *denied,* in part, and Defendants' motion for summary judgment is *granted*, in part, and *denied*, in part**.**

## DEFENDANTS' MOTION TO STRIKE

Defendants seek to strike portions of the Affidavit of Joaquim Lopes (Docket No. 33-2) which Plaintiff relies on in support of its motion for summary judgment. More specifically, Defendants seek to strike ¶10 (asserting that Moutoudis determined that he could make more money if he owned the property from which the Dunkin Donuts franchise would be operated) and ¶13 (asserting that Moutoudis obtained permits to build a strip mall not far from the Property) on the grounds that the asserted statements constitute inadmissible hearsay, are not based on personal knowledge and/or are based on unauthenticated documentation.   Plaintiff argues that the statements are based on personal knowledge, and/or were admitted by Defendants in their discovery responses or can be inferred therefrom. I agree with the Plaintiff that the statements are self-evident based on Defendants' discovery responses. The motion to strike is denied.

## THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

### Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   *Carroll v. Xerox Corp*., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)).

"'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.'"   *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof.   *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'"   *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.* (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted). "Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014)(citation to quoted case omitted).

## Facts[1]

Jenny B is a limited liability company organized in Connecticut. In 2003, Dunkin Donuts auctioned some franchises including one located in Brooklyn, Connecticut (the "Brooklyn Dunkin Donuts").   That location was owned by Jenny B. Moutoudis and Konstantinos Frangakis ("Frangakis") formed Danielson, a limited liability company, in 2003 to acquire and operate the Brooklyn Dunkin Donuts. Prior to this, Moutoudis was a minority member of a limited liability corporation that owned several Dunkin Donuts franchises in Massachusetts.

Dunkin Donuts required the party assuming the Brooklyn Dunkin Donuts francise to execute a new lease agreement on the terms already in place. On June 19, 2003, Jenny B and Danielson entered into a commercial lease agreement ("Lease") for Danielson to operate a Dunkin Donuts franchise on the Property. Frangakis, the managing member, signed on behalf of Danielson. The initial term of the Lease was twenty (20) years ending on June 19, 2023. Danielson's monthly rent was based on a combination of a fixed rent of $8,238.41 per month, ten percent (10%) of the annual gross sales over $988,610 of Dunkin Donuts' products, and property related expenses. The Lease provided that if Danielson defaulted, it would be responsible for all costs incurred by Jenny B, including attorney's fees.

### Jenny B's Version of the Facts

Danielson reported gross sales of $1,545,523 in 2014, $1,584,993 in 2015, and $1,669,805 in 2016. Thus, the average gross sales for each of these three years exceeded the threshold for Danielson to pay Jenny B revenue-based rent payments under the Lease.

---

[1] While both sides have filed statements of material fact in support of their respective motions for summary judgment, neither side's opposition included a concise statement of the material facts of record as to which they contend there exists a genuine issue to be tried. *See* LR, D.Mass., 56.1. For that reason, for purposes of each side's motion for summary judgment, I have adopted the statement of material facts filed in support thereof. That being said, the parties largely agree regarding the facts material to their dispute.

Consequently, the average monthly rental payment made by Danielson to Jenny B during this three-year period was $13,334.24. Danielson was also responsible for property related expenses, such as real estate taxes, insurance, and municipal charges.

At some point, Moutoudis, who owned Danielson, determined that he could increase his profit if he owned the property from which the Dunkin Donuts was operated. Thus, on November 9, 2015, through Toudis, a Connecticut limited liability corporation he owns and controls, he purchased property at 445 Providence Road (the "Toudis Property"). The Toudis Property is located about 500 yards from the Property. Moutoudis then obtained permits to build a retail strip mall which would include a Dunkin Donuts that would start operating in 2017.

On April 11, 2017, Danielson notified Jenny B that it would be permanently closing the Dunkin Donuts, vacating the premises and closing the Property on July 31, 2017.   However, Danielson did not vacate the Property until October 30, 2017.   On that same date, a Dunkin Donuts franchise began operating on the Toudis Property. Danielson ceased operating after it vacated the Property and last payed rent to Jenny B on October 1, 2017. Danielson also failed to pay real property taxes for 2017, 2018 and 2019 ($24,078.76 per year).

Defendants' Version of the Facts

Toudis, it is a separate business entity from Danielson: they do not comingle funds, do not have dealings with each other and do not share any properties in common. Toudis does not own the Dunkin Donuts operating on the Toudis Property, although it acknowledges that on its property, there is "a coffee shop of some type with a drive-up window."[2] Danielson posted

---

[2] It is not clear to the Court what Defendants seek to gain by utilizing this description to describe the Dunkin Donuts which is operating on the Toudis Property. The Court does not make credibility judgments when deciding motions for summary judgment and, therefore, will ignore this blatant attempt to misrepresent the facts.

losses of over $35,000 in 2013, $34,000 in 2015, $67,000 in 2017. It also claims it lost $91,000 in the sale of its products in 2017.

Danielson vacated the Property because the building was old and had never been updated by Jenny B. The franchise agreement required remodeling that was becoming increasingly expensive and as a financial matter, Danielson could not justify the cost of remodeling a store that it did not own. Lack of updates to the building caused utility costs to greatly increase and the minimum wage had doubled.   It became increasingly difficult for Danielson to maintain economic viability of the business based upon the rent structure.

## CHOICE OF LAW

The Court must first determine whether Massachusetts or Connecticut law applies to Plaintiff's claims. Defendants argue that Connecticut law should apply to all of Plaintiff's claims first, because the Lease provides that the proper venue for any claims brought pursuant thereto is Windham County, Connecticut and, in the alternative, because Connecticut is the state with the most significant contacts to this matter. Plaintiff argues that while the Lease contains a choice of forum provision (which the parties jointly agreed not to enforce), it is silent as to choice of law. Plaintiff asserts that Massachusetts law applies because it is the state with the most significant contacts to this matter.[3]

---

[3] Defendants' assertion that the parties' agreement in the Lease regarding Windham County, Connecticut as the choice of forum is determinative of the law to be applied is meritless. First, all parties have waived the right to enforce the forum selection clause contained in the Lease. Second, even were the forum selection clause enforced, it does not follow that Connecticut law would automatically apply. Instead, the only consequence of this action being brought in a Connecticut court would be that the court would apply Connecticut choice of law rules to determine what state's law applies. *Accord Reynoso v. LaserShip, Inc.*, 322 F. Supp. 3d 211, 216 (D. Mass. 2018). The case that Defendants rely on in support of their argument, *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 8 (1st Cir. 2000), does not stand for the proposition for which it is cited. In *Foster-Miller,* the First Circuit noted that where the parties agree as to the *law* to be applied, no further analysis is required-- it does not stand for the proposition that where the parties have agreed as to the *forum* where the action must be brought, that forum's law applies with no further analysis.

"Where, as here, a federal court exercises diversity jurisdiction, '[t]he question of which state's law applies is resolved using the choice of law analysis of the forum state.' "   Thus, the Court applies Massachusetts choice of law principles to determine which state's law apply. "The Massachusetts Supreme Judicial Court has decided 'not to tie Massachusetts conflicts law to any specific choice-of-law doctrine, but seek[s] instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole,' and looks to the Restatement (Second) of Conflict of Laws (1971) as an 'obvious source of guidance.'" *Fire Ins. Exch. v. Pring-Wilson*, 778 F. Supp. 2d 116, 125 (D. Mass. 2011)(internal citations and citation to quoted cases omitted).   However, the first step in the "choice-of-law analysis is to determine whether there is an actual conflict between the substantive law of the interested jurisdictions." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006).   Where there the outcome would be the same regardless of which state's law applies, there is no conflict and the court need not resolve the choice of law question. *See DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 399 (D. Mass. 2017).   Accordingly, the Court will review whether there is any difference between Connecticut law and Massachusetts law with respect to Plaintiff's claims.

The parties have not addressed whether there are any differences between Massachusetts and Connecticut law with respect to the breach of contract, tortious interference, reach and apply and breach of fiduciary duty claims. Therefore, the Court will analyze those claims under the Massachusetts choice of law principles. Plaintiff contends that Connecticut's fraudulent transfer law is identical to Massachusetts law and has submitted a comprehensive brief in support of its argument which had not been challenged by the Defendants. Since Defendants have not

identified any conflict between Massachusetts and Connecticut law, Massachusetts law will be applied regarding that claim.[4]

Breach of Contract

For contract claims, Massachusetts employs a " 'functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole'" as set forth in the Restatement (Second) of Conflict of Law.   "Under that approach, the court 'applies the substantive law of the state which has the more significant relationship to the transaction in litigation' and considers a myriad of factors. The analytical framework involves 'section 6(2) of the Restatement [which] sets out a general conflicts analysis for all legal disputes, section 188 [which] provides a generic contract analysis." *Bergin v. Dartmouth Pharm. Inc.,* 326 F. Supp. 2d 179, 181 (D. Mass. 2004)(internal citations and citations to quoted cases omitted).

The relevant §6 factors are:

(2) [T]he contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

---

[4] In another case, the Court has determined that there may be differences between Massachusetts and Connecticut fraudulent conveyance law. *See Foisie v. Worcester Polytechnic, Inst.,* 408 F. Supp. 3d 7, 14 (D. Mass. 2019)(court does not find that Massachusetts and Connecticut would necessarily apply fraudulent conveyance law in same way). However, it is the Defendants' responsibility to establish that there would be a difference as to how Massachusetts and Connecticut fraudulent conveyance law could differ under the circumstances of this case and they have failed to do so.

> (3) If the place of negotiating the contract and the place of performance
> are in the same state, the local law of this state will usually be applied ….

Restatement (Second) of Conflict of Laws § 188 (1971).

In this case, the Court has little information regarding the above relevant factors.   It is unclear where the contract was negotiated. From the parties submissions, the attorneys were based in Massachusetts; Jenny B was organized under the laws of Connecticut and its managing members, Joaquim and Maria Lopes, were domiciled in Florida; Danielson was organized under the laws of Connecticut and its managing member, Moutoudis, was domiciled in Massachusetts; the subject matter of the contract was Connecticut; and the contract was, in part, to be performed in Connecticut, but also would, in part, be performed in the state(s) to and from which rental payments were made (which is unknown). The parties are in possession of the information required by the Court to evaluate these factors. Simply put, they have not provided the Court with the facts necessary for it to make an informative ruling on an issue which could be case determinative. Based on the record before me, I find that the entities involved were all organized under the laws of Connecticut, the subject matter primarily involves Connecticut and some, if not the majority, of the contract will be performed in Connecticut. Under the circumstances, I find these to be the most significant contacts and therefore, Connecticut law applies to the breach of contract claim.

<u>Tortious Interference and Breach of Fiduciary Duty</u>[5]

Massachusetts also follows the Restatement (Second) to determine the applicable law for claims sounding in tort. More specifically, the "rights and liabilities of the parties with respect to

---

[5] I agree with the Defendants that Plaintiff's reach and apply claim is premature in that at present, Plaintiff does not have a judgment. Since the Court intends to reserve ruling on the viability of Jenny B's reach and apply claim until the conclusion of trial, it is not necessary for me to address at this time whether Massachusetts or Connecticut law applies thereto.

an issue in tort are determined by the local law of the state which, with respect to that issue, has

the most significant relationship to the occurrence and the parties under the principles stated in §

6." *Resolute Mgmt. Inc. v. Transatlantic Reinsurance Co.*, 87 Mass. App. Ct. 296, 302, 29

N.E.3d 197, 202 (2015).   Contacts to be considered in applying the principles of § 6 to

determine the law applicable to Jenny B's tortious interference and breach of fiduciary duty

claims include:

>   (a) the place where the injury occurred,
>   (b) the place where the conduct causing the injury occurred,
>   (c) the domicil, residence, nationality, place of incorporation and place of
>       business of the parties, and
>   (d) the place where the relationship, if any, between the parties is centered.

>   These contacts are to be evaluated according to their relative importance with
>   respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971). These factors also favor applying

Connecticut law as the injury has occurred primarily in Connecticut, the conduct causing the

injury occurred in Connecticut, the corporate parties are all organized under the laws of the state

of Connecticut and with respect to the Lease, the relationship between the parties is centered in

Connecticut. The domicile of the managing members of the respective corporation and place of

business of the corporations, which include Florida, Massachusetts and Connecticut, are not

significant enough to overcome the factors which favor Connecticut. Accordingly, Connecticut

law applies to these tort claims.

## THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Jenny B seeks summary judgment on all its claims against the Defendants. Defendants do

not oppose summary judgment entering in favor of Jenny B on the issue of liability with respect

to Count I (breach of contract) but contend that there are genuine issues of material fact

regarding damages. In their cross-motion for summary judgment, Defendants seek summary

judgment as to the tortious interference, breach of fiduciary duty and fraudulent conveyance (MFTA) claims.

## Discussion

### The Breach of Contract Claim

Jenny B seeks summary judgment against the Defendants on its claim for breach of contract. Jenny B contends that it is currently owed $338,176.56 under the Lease and that its total damages will exceed $625,000. Defendants concede that Danielson breached the Lease but assert that there are genuine issues of material fact regarding any damages due thereunder, in particular, whether Jenny B has complied with its duty to mitigate its damages.

Little discussion is warranted on this claim.   Both parties agree that Danielson breached the Lease which, by its terms, would terminate on June 19, 2023.   Danielson informed Jenny B it would cease operating at the Property on July 31, 2017. However, Danielson continued to operate the Dunkin Donuts at the Property until the end of October 2017 at which time it closed. Danielson has not payed rent to Jenny B since October 2017.

> Connecticut law is clear that "[i]n an action for rent due, a lessor of commercial property *is generally under no obligation to mitigate his damages after the lessee fails to pay rent*. Such an obligation arises only if the lessor manifests an intent to terminate the tenancy either by taking an unequivocal act showing this intent or by bringing an action for damages based on the tenant's breach of contract. In other words, "[w]hen the lessee breaches a lease for commercial property, the lessor has two options: (1) to terminate the tenancy; or (2) to refuse to accept the surrender.... Where the landlord elects to continue the tenancy, he may sue to recover the rent due under the terms of the lease. Under this course of action, the landlord is under no duty to mitigate damages.... When the landlord elects to terminate the tenancy, however, the action is one for breach of contract ... and, when the tenancy is terminated, the landlord is obliged to mitigate his damages.

*Brennan Assocs. v. OBGYN Specialty Grp., P.C.,* 127 Conn. App. 746, 754, 15 A.3d 1094, 1100 (2011)(internal citations and citation to quoted case omitted).   Where the landlord seeks to

enforce the terms of the lease in court, there is no duty to mitigate.   *MacKeeber Assocs., LLC v. Connecticut Studios, LLC*, No. CVH-8549, 2016 WL 9108557, at *11 (Conn. Super. Ct. Sept. 21, 2016)(under circumstances of case, plaintiff's pursuit of lawsuit to enforce defendant's financial responsibilities under contract does not constitute discontinuation of tenancy, landlord is entitled to seek all damages as contemplated by the lease)

Where the landlord has a duty to mitigate,

> The duty to mitigate damages [does] not require the plaintiff [landlord] to sacrifice any substantial right of its own ... or to exalt the interests of the tenant above its own.... It [is] required to make reasonable efforts to minimize damages. What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier.... [T]he general rule for the measure of damages in contract is that the award should place the injured party in the same position as he would have been in had the contract been performed....

*Id.*

In this case, there is a question of fact as to whether Jenny B has a duty to mitigate or is entitled to the full amount of rental damages it seeks. Moreover, there are genuine issues of material fact as to the amount of rental damages it is due under the terms of the Lease *i.e.,* that part of the rental based on expenses and a percentage of profit. Therefore, summary judgment is *granted o* Plaintiff's breach of contract claim with respect to liability but denied with respect to damages.

<u>The Tortious Interference Claim</u>

Jenny B has asserted a claim for tortious interference against Moutoudis and Toudis. Both sides seek summary judgment on this claim.   "Under Connecticut law, a claim for tortious interference with business expectancies requires a showing that a third party adversely affected the contractual relations of two other parties and that such interference was motivated by some improper means or motive, such as maliciousness, fraud or ill-will. However, a direct party to a

contract, or an even indirect party, such as an agent, cannot be held liable for contractual interference." *McCulloch v. Hartford Life & Acc. Ins. Co.*, 363 F. Supp. 2d 169, 180 (D. Conn. 2005), *adhered to on reconsideration sub nom. McCulloch v. Hartford Life & Accident Ins. Co.*, No. 3:01CV1115 (AHN), 2005 WL 8165602 (D. Conn. Sept. 29, 2005)(internal citation omitted); *see also Elliott v. Staron*, 46 Conn. Supp. 38, 49, 735 A.2d 902, 909 (Super. Ct. 1997), *aff'd,* 54 Conn. App. 632, 736 A.2d 196 (1999)(internal citation and citation to quoted case omitted)(to establish cause of action for tortious interference with business relations under Connecticut law, plaintiff must prove existence of beneficial relationship, defendant's knowledge of relationship, defendant's intent to interfere with that relationship and that it suffered actual loss; "This tort requires proof of 'misrepresentation, intimidation or molestation ... or that the defendant acted maliciously.'").

Defendants argue that since Moutoudis is the managing member of both Toudis and Danielson, he and Toudis are not "strangers" to the Lease, that is, they are indirectly parties thereto. Put another way, there is a "unity" of interest between Toudis/Moutoudis and Danielson, and therefore, they cannot as a matter of law, interfere with their own contract. *See Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1037 (2d Cir. 1995). Defendants may ultimately be correct particularly with respect to Moutoudis[6]. However, *Boulevard Assocs.,* the

---

[6] In *Boulevard Assocs.*, the parent company/sole shareholder directed its subsidiary to stop performing under an unprofitable lease. The court held that there is unity of interest between a corporation and its sole shareholder and therefore, the sole shareholder (in *Boulevard Assoc.,* the parent company) is not an independent party capable of interfering with itself. 72 F.3d at 1036. Defendants have not cited any authority to support their assertion that this theory would apply to an LLC that directs another LLC with the same controlling member to stop performing under a contract. I agree with Defendants that generally, the managing member of an LLC is not liable for tortious interference where such member induces that LLC to breach a contract. *See Hibbs v. Berger*, 430 S.W.3d 296, 318 (Mo. Ct. App. 2014)(manager, acting within his or her authority, has authority and is privileged to induce a breach of a corporate contract); *Bogle v. Summit Inv. Co., LLC*, 2005-NMCA-024, ¶ 18, 137 N.M. 80, 88, 107 P.3d 520, 528 (NM. Ct. App. 2005)(as manager for LLC, manager cannot interfere with its contracts; manager may be liable if acted with improper motive or means). However, it is not clear to the Court that Toudis would fall within the unified interest analysis. At this stage of the proceedings, Defendants have taken the position that Toudis and Danielson are separate legal entities which don't comingle funds and maintain completely independent

case cited by Defendants in support of this argument, recognizes an exception to the rule that where there is a unity of interest, a person/entity is privileged to induce another to breach a contract: where the action involves "fraud, misrepresentation, intimidation o/r molestation' or 'malic[e]' [it] may give rise to a claim of tortious interference with contract." *Id.*, at 1037. On the record before me, there is a genuine issue of material fact regarding whether Moutoudis and/or Toudis acted with improper motive or means.   The cross-motions for summary judgment are both denied as to this claim.

<u>Breach of Fiduciary Duty</u>

Although Jenny B seeks summary judgment on all claims, it does not include any legal argument regarding the breach of fiduciary duty claim in its memorandum in support of its motion for summary judgment. For that reason, to the extent that it seeks summary judgment with respect to this claim, the motion is denied. Defendants seek summary judgment on this claim on the grounds that such claim is barred by the express provisions of the Lease.

The only Connecticut case dealing with this issue is a recent unpublished opinion in which the court analyzes the issue and concludes that the general rule is that there is no fiduciary duty owed by a landlord to a tenant and vice versa. *See Andersson v. Walsh,* No. NNHCV166063877S, 2017 WL 5015189, at *2 (Conn. Super. Ct. Sept. 13, 2017).   Following is a summary of the *Andersson* court's analysis including cited authority:

> "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.*, 255 Conn. 20, 38 (2000).   Where the parties were dealing at arm's length, that is the relationship is not "one of dominance and dependence," or "the parties were not engaged in a relationship of

---

corporate structures. This contention is at odds with Defendants assertion that for purposes of this claim, they should viewed as legal entities having a unified interest. Because the Court finds that the tortious interference claim must survive in any event, *see* discussion *infra*, it is not necessary for me to resolve this issue.

special trust and confidence," the court will not find a fiduciary relationship. *Id.,* 39. The relationship between a landlord and a tenant generally is not a fiduciary one, except under rare and unusual factual circumstances or where provisions in the lease impose special duties and obligations. *1026 Restaurant, Inc. v. Hoffzimer*, 21 Misc.2d 211, 192 N.Y.S.2d 856 (1959).

Other courts have reached similar conclusions. S*ee also El Paso Nat. Gas Co. v. Kysar Ins. Agency, Inc.*, 1979-NMCA-152, ¶ 16, 93 N.M. 732, 736, 605 P.2d 240, 244 (NM.Ct. App. 1979)   (a lease does not create a fiduciary relationship between landlord and tenant); *accord Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 367 (N.D.N.Y. 2013), *aff'd,* 561 F. App'x 48 (2d Cir. 2014)(landlord and tenant did not have a fiduciary or confidential relationship where they were sophisticated parties to an arm's length transaction).

Based on the record before me, there is no evidence which would support a finding that any Defendant breached a fiduciary duty to the Plaintiff.   First, this was a commercial lease transaction with sophisticated parties on both sides, *i.e.*, it was an arm's length transaction. Moreover, there are no unusual or rare circumstances which exist which would create such a special relationship of trust and confidence between the parties[7]. Finally, the Lease does not contain any provisions which would impose special duties and obligations on Danielson or Moutoudis such that a fiduciary duty was created. On the contrary, as pointed out be Defendants, the Lease provisions undercut Plaintiff's argument that a fiduciary relationship exists. Summary judgment shall enter for the Defendants on this claim.

---

[7] In Plaintiff's opposition, it argues that this cause of action is primarily against Moutoudis first, because he tortuously interfered with its relationship with Danielson under the Lease, and second, because its managing member was an absentee owner, it relied on and trusted Moutoudis to accurately report Danielson's revenues for purposes of determining the rent due. The Court has grave doubts as to the validity of Plaintiff's assertion that Moutoudis, the managing member of its tenant, owed it a fiduciary duty. In any event, Plaintiff has failed to establish that Moutoudis owed it a fiduciary duty on the facts of this case. Plaintiff's attempt to bootstrap its tortious interference claim to create a fiduciary relationship is unavailing, and discussion of Plaintiff's assertion that Moutoudis had a *fiduciary* obligation to it regarding Danielson's financial position is not warranted as Plaintiff has not cited any legal or contractual authority to support this contention.

<u>Fraudulent Conveyance Under The MFTA</u>

Jenny B asserts that Moutoudis with intent to hinder, delay or defraud it set up Toudis "or other entities" to run the Brooklyn Dunkin Donuts on the Toudis Property, and had Danielson transfer its assets to such entity without Danielson receiving reasonably equivalent value for the transfer thereby leaving it insolvent. Defendants (applying Connecticut law) assert that Jenny B has failed to satisfy the elements of a fraudulent transfer claim because it cannot establish intent, there is no evidence that Danielson transferred any of its assets to Toudis or any other entity, and Danielson's assets were sold at a loss.

> The UFTA … provides an expeditious means for creditors to satisfy their claims. It prescribes a transfer made by the debtor with either the actual intent to hinder, delay, or defraud any creditor of the debtor, or made by the debtor without receiving a   reasonably equivalent value in return and either having an unreasonably small amount of remaining assets or an intent or reasonable belief that the transfer would render him insolvent.
> A "transfer" is defined as "parting with an asset" and an "asset" is simply "property of a debtor." Notably, the statute prescribes a transfer as fraudulent regardless of "whether the creditor's claim arose before or after the transfer was made.

*Allied Home Mortg. Capital Corp. v. Mark*, No. CIV.A. 12-10158-GAO, 2014 WL 4964728, at *10–11 (D. Mass. Sept. 30, 2014)(internal quotation marks, alterations, citations and citations to quoted cases omitted).  Danielson, who claims an inability to pay its obligations to Jenny B, terminated the Lease and closed the Dunkin Donuts at the Property, while a Dunkin Donuts was simultaneously opened down the street on the Toudis Property. I agree with Jenny B that the commonality of ownership between Danielson and Toudis raises red flags as to whether Danielson fraudulently transferred assets to Toudis or another related entity with the express intent to defraud it. Defendants deny that Toudis currently owns or operates the Brooklyn Dunkin Donuts. Additionally, although tax records *suggest* that Danielson was insolvent when it terminated the Lease, the record is unclear as to what assets, if any, it held at the time, to whom

such assets were transferred and what value it received in return. Defendants assert that Danielson's assets were sold at a loss. It is not clear how this supports their contention there was no fraudulent transfer given that Defendants have been reticent to identify the entity to which the assets were transferred. There are also genuine issues of material fact as to whether Danielson was insolvent at the time it terminated the Lease. Finally, as pointed out by the Defendants, whether they acted intentionally to defraud Jenny B is a question of fact for the jury. Because there are genuine issues of material fact regarding all aspects of this claim, the cross-motions for summary judgment are denied.

### Conclusion

It is hereby Ordered that:

(1) Plaintiff's Motion for Summary Judgment (Docket No. 31) is ***granted*** as to Count I (on liability only) and ***denied***, in all other respects;

(2) Defendants Dimitrious Moutoudis and Toudis LLC's Motion For Summary Judgement (Docket No. 35) is ***granted*** as to Count V and ***denied*** in all other respects; and

(3) Defendants' Motion to Strike Paragraphs 10 and 13 of the Affidavit Joaquim Lopes (Docket No. 44) is ***denied***.

**/s/** *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**